cells to protect themselves against inmates exposing themselves and masturbating at them. They were told that they could not do this, and they had to take down the screens.

156.   While the inmates exposed themselves and masturbated at Adair, as well as at other times, the inmates often made sexually degrading and demeaning comments to Adair, such as "I wanna fuck you," and made sexually degrading and demeaning gestures simulating sexual intercourse.

157.   Adair wrote numerous DRs on these inmates as well as CCs. However, these had no effect. It was further discouraging to Adair to write DRs because of the many formal requirements involved.

158.   The Department did not give Adair any training to prepare her for or to address sexual harassment by inmates.

159.   The sexual harassment described above occurred throughout Adair's employment at Washington CI. Adair did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Carol Woods

160.   Plaintiff Carol Woods is employed by the Department as a Senior RN and Psychiatric Nurse at Washington CI. She has been so employed since February 1996.

161.   Woods' duties as a Senior RN include dispensing medications, responding to medical emergencies, administering insulin for diabetic inmates and drug regimens for HIV inmates, and making sick calls to male inmates in close management custody as well as dispensing medications and attending to open population inmates in the medical building and in the infirmary at Washington CI. She has also acted as Charge Nurse. Her duties require regular contact with


DEFENDANT'S EXHIBIT
B2
Blumberg No. 5114

inmates in close management custody.

162.    Throughout Woods' employment at Washington CI, inmates in close confinement have regularly exposed themselves and masturbated at her when she dispenses medications and responds to emergency calls. While doing so, the inmates make sexually degrading and demeaning comments to her, such as calling her "pussy-ass," or "I bet your pussy is wet," or "Come in here, and I'll show you what I've got for you," and the like. The inmates regularly make similar comments and wolf whistle as Woods and other female nurses walk to and from close management housing.

163.    The sexual harassment is so severe on daily medication passes that the female nurses alternate duty.

164.    Inmates in the isolation rooms in the infirmary also routinely expose themselves and masturbate at Woods and the other female nurses. She has also had inmates in open population masturbate at her.

165.    Inmates are supposed to be dressed and sitting on their bunks when medication passes are announced. Rarely is this rule ever enforced.

166.    Woods has written numerous DRs on inmates. Some of these appear to have been lost. In any event there has been no action as a result of them. She has also been told that she should not write DRs.

167.    Woods has had a captain tell her in response to her complaints about the sexual harassment that "Well, he's a man, and he's in prison. What do you expect?" Other security personnel tell her that "You've forgotten where you are. You're in a male prison."

168.    The Department did not give Woods any training to prepare her for or to address

sexual harassment by inmates.

169.    The sexual harassment described above occurred throughout Woods' employment at Washington CI. Woods did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Melanie Beckford

170.    Plaintiff Melanie Beckford was employed by the Department as a Senior Registered Nurse at the Department's Martin Correctional Institution ("Martin CI") in Martin County.  She held this position since her hire in or around July 1995 until February 2002.  She has been licensed in Florida since 1992.

171.    In her position as Senior Registered Nurse, Beckford's primary duties included assessing medical and psychiatric emergencies and administering medicines as well as reporting to the physicians on staff her assessment.  She worked the night shift and had the responsibilities as the charge nurse during her shift.  Her duties required regular contact with inmates in close management custody

172.    Throughout her employment at Martin CI, inmates regularly exposed themselves and masturbated at Beckford when she was making daily rounds in the close management dorms. The majority of all medical emergencies of inmates in close management were faked by inmates, and when Beckford responded, they regularly would expose themselves and masturbate at her.

173.    The inmates in close management knew that Beckford was coming to visit, because a Correctional Officer would call for her at the request of an inmate. When she was inside the close management dorms and when she was walking to the close management facility from the medical unit, inmates routinely shouted at her sexually degrading and demeaning

- 33 -

propositions and commented on her breasts and other parts of her body.

174.    Similarly, inmates in the medical unit where infirmary and "pink" cells were located sexually harassed Beckford by exposing themselves, masturbating at her and, on one occasion, ejaculating and licking semen in the presence of Beckford. When this would happen in the medical unit, security personnel were up front in the "cube" away from the observation areas where the inmates could be observed. When security personnel were around, the inmates would not engage in the harassment.

175.    The above described conduct was well knows to the Department. Beckford routinely made a record of each incident and, in many cases, wrote DRs, which she turned in to prison security personnel, either in the medical unit or in the control tower. She often inquired after the disciplinary reports but continually got not response other than the disposition of the report was unknown. On numerous occasions Beckford discussed the harassment by male inmates at staff meetings. She further routinely informed prison security about it, and prison security personnel witnessed the behavior in many, many instances. The typical response of security personnel was to ask the nurses what they expected or to act as though it did not happen. There was little effort at all to stop the harassment from happening. On some occasions security personnel laughed in response to it.

176.    The Department did not give Beckford any training to prepare her for or to address sexual harassment by inmates.

177.    The harassment described above occurred throughout Beckford's employment at Martin CI. Beckford did nothing to welcome the conduct, and she found it offensive and physically disgusting.

- 34 -

Charlene Fontneau

178.   Plaintiff Charlene Fontneau was employed by the Department as a Senior LPN at Martin CI from July 1998 to February 2001, when she was transferred to the Department's Central Florida Reception Center.

179.   Fontneau's duties at Martin CI were primarily as a confinement medication nurse which entailed dispensing medications to male inmates in close confinement and monitoring the dispensation. Typically, she would dispense medication twice daily in close confinement  housing. Her other duties included responding to emergency calls of inmates in close confinement and attending to inmates housed in the infirmary. Fontneau's duties required regular contact with inmates in close management custody.

180.   When Fontneau went into the confinement house, male inmates, knowing that she was coming, would regularly expose their genitals and masturbate in view of the glass cell door windows. Some security officers pretended not to see it. Others told her that the cellblock was the inmates' "house" and that the inmates could, therefore, do what they wanted to do.  In Housing D of the close management housing, the locks had been removed from the food slots which gave male inmates additional opportunities to harass Fontneau and other female nurses.

181.   On one occasion, a Captain Wilds told Fontneau that it was a waste of time for his Correctional Officers to accompany her while making daily medication rounds. He suggested to Fontneau that she get a key and go by herself. Often instead of Correctional Officers, trainee officers were sent to accompany Fontneau, because there were too few Correctional Officers to escort her.

182.   On one occasion, an inmate in close confinement inserted his erect penis through

- 35 -

the food slot when it was opened. Fontneau refused to dispense medication to the inmate but was ordered to do so.

183. Inmates routinely called her "pussy," "cunt" and other sexually degrading and demeaning epithets. One inmate threatened to stick his "dick" in her "pussy." On another occasion in the lobby of the medical unit, an inmate had a hole in the crotch of his pants through which he exposed himself and masturbated. Fontneau told the male Correctional Officer not to let the inmate into the infirmary. The officer let the inmate in and laughed. On another occasion, Fontneau witnessed an inmate masturbating in the presence of a Correctional Officer while one of her fellow female nurses took the inmate's blood pressure.

184. Fontneau had to dress so as to completely cover all parts of her body. She could not bend over at any time in the close confinement housing, because the inmates shouted sexual epithets and propositions.

185. On her walk to the close management housing, inmates, knowing she was coming, would shout to her sexually degrading and demeaning epithets, such as "I can smell your pussy." One inmate told her that it was like prostitution in that inmates would pay other inmates to make sick calls so that they could masturbate when the female nurse arrived. This practice was well known by security personnel.

186. Fontneau and other nurses routinely wrote DRs regarding the above inmate conduct. Many of the DRs she initially wrote were thrown out, because the nurses were told they had to have their own codes for DRs. Later they got the codes, but even after writing DRs they were unable to determine what had happened to them. She believes that many were lost.

187. Not having any success with DRs, Fontneau began giving inmates written

- 36 -

corrective counseling (CC) statements. She was told that some of these were not worded right, and they were thus disregarded.

188.    Fontneau and the other nurses were also told to file incident reports regarding the above conduct. They did so but were then told that they were writing too many of them.

189.    The policies and practices that existed to curb the harassment were not enforced. Inmates were supposed to be dressed in shirts and pants before coming to their doors. Correctional Officers tried to enforce this but ultimately lost interest, because nothing was done to inmates who violated the rule. Fontneau and other nurses asked for a rule that inmates not getting medications be required to remain on their bunks. This was refused. Fontneau and other nurses also requested one-way windows in cell doors. This was refused.

190.    Fontneau and other female nurses met with the Martin CI superintendent and director of nursing about the problems of inmate harassment described above. The superintendent claimed he knew nothing of the harassment, because he did not review the disciplinary reports. He told them to do incident reports.

191.    The Department did not give Fontneau any training to prepare her for or to address sexual harassment by inmates.

192.    The harassment described above occurred throughout Fontneau's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Tita de la Cruz

193.    Plaintiff Tita de la Cruz is employed by the Department as a Senior Licensed Practical Nurse ("LPN") at its Lowell facility in Marion County. Before working at Lowell, Cruz

- 37 -

worked for the Department at Martin CI as a Senior LPN from June 15, 1996 through August 2001.

194.    De la Cruz's duties as a Senior LPN at Martin CI included dispensing medication to male inmates and responding to medical and psychiatric emergency calls of male inmates. Her duties required regular contact with inmates in close management custody.

195.    Throughout her tenure at Martin CI, inmates in close management custody regularly exposed themselves and masturbated at de la Cruz. While exposing themselves and masturbating at de la Cruz, as well as at other times, inmates made sexually degrading and demeaning comments to de la Cruz, such as "China doll," "Filipino whore," "what are you going to do for me for money, China doll," and the like. Inmates stood on the toilets in the cells when exposing themselves and masturbating at de la Cruz so that they could better be seen by her.

196.    Inmates in the isolation or "pink" rooms in the medical unit building also exposed themselves and masturbated at de la Cruz and other female nurses. These inmates would fake psychiatric emergencies to get into the "pink" rooms so that they could expose themselves and masturbate at her and other nurses. De la Cruz put up screens over the windows on the "pink" rooms to try to stop the harassment. She was told by a Correctional Officer that she had to take them down, because it was a "security threat."

197.    De la Cruz and the other nurses at Martin CI wrote DRs and corrective counseling statements (CCs) on the inmates. However, little, if anything, came of these efforts to stop the harassment. In one instance, she believes the DR was trashed, because the inmate was allowed to be a run-around. De la Cruz was also required to notify and get the approval of the officer in charge before writing a DR.

- 38 -

198.   The Department did not give de la Cruz training to prepare her for or to address sexual harassment by inmates.

199.   The harassment described above occurred throughout De la Cruz's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Lee Wascher

200.   Plaintiff Lee Wascher was employed by the Department as a Senior RN at Martin CI from March 2001 to July 2001.

201.   Wascher's duties as a Senior RN at Martin CI included dispensing medication and answering sick calls to male inmates housed in the close management facility as well as inmates in the infirmary and "pink" cells in the medical unit. Her duties required regular contact with inmates in close management custody.

202.   While performing her duties in the close management housing, male inmates regularly exposed themselves and masturbated at her. The inmates frequently called out to her and other female nurses to get their attention and once they had done so fondled their genitals and masturbated from behind the glass windows in their cell doors.

203.   On numerous occasions male inmates faked sick calls for Wascher and other female nurses for the purpose of masturbating at them.

204.   Correctional Officers did little or nothing to stop the inmate, and one particular officer appeared to be amused by the harassment Wascher was suffering.

205.   The Department did not give Wascher any training to prepare her for or to address sexual harassment by inmates.

- 39 -

206.     The harassment described above occurred throughout Wascher's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Linda Jones

207.     Plaintiff Linda Jones worked as a Senior Registered Nurse for the Department at Martin CI and Glades Correctional Institution ("Glades CI") from around October 1999 to around February 2000. During this time she worked between the two facilities.

208.     Jones' duties as a Senior RN at Martin CI included dispensing medication to and responding to medical emergencies of male inmates in close confinement as well as inmates in open population and in the infirmary. Her duties required regular contact with inmates in close management confinement.

209.     Within her first two weeks working at Martin CI, inmates in close management housing exposed themselves and masturbated at her while she was dispensing medication through the food slot in their cell doors. Approximately half of the inmates in Housing Y of the close confinement facility routinely masturbated at her. At the time they were doing it, the inmates called her by her name, often sang the pop song "Me and Mrs. Jones," and taunted her with sexually degrading and demeaning comments, such as "you know you want it."

210.     On one occasion, among many, an inmate waiting in the sick call room, with a guard in the area, exposed himself and masturbated as he stared at Jones.

211.     Jones wrote numerous DRs on these inmates. On a number of other occasions, because she did not have an officer to witness the harassment and because she was discouraged from writing DRs without a witness, she did not. She was also told that DRs stating that an

- 40 -

inmate was "masturbating" would be rejected. Rather, she was told that she had to describe in graphic detail every aspect of the inmate's harassment. Finally, after writing numerous DRs without any effect, she gave up, reasonably believing that it was useless to continue.

212.  Jones was told by Correctional Officers that the inmate housing was like the inmates' "home" and that they could not make them do something in their home. She was told that the harassment was just something that happens and that she needed to get over it.

213.  The Department did not give Jones any training to prepare her for or to address sexual harassment by inmates.

214.  The harassment described above occurred throughout Jones' employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Joyce Meyer

215.  Plaintiff Joyce Meyer was employed by the Department at Martin CI as a Senior LPN. She was initially hired in September 1989 and worked until around 1993. She returned in or around 1995 until 1999. She then returned a second time in February 2000 and worked as a Senior LPN until she voluntarily resigned in July 2001.

216.  Meyer's duties as a Senior LPN at Martin CI included preparing medications and dispensing medication to inmates in the medical unit and in close management as well as making sick rounds for close management inmates. She typically dispensed medications in close management twice daily.  Her duties required regular contact with inmates in close management confinement.

217.  Each time Meyer made rounds to dispense medication in the close management

- 41 -

dorms inmates exposed themselves and masturbated at her. While the inmates masturbated at her they made sexually degrading and demeaning comments, such as "I can smell your pussy," "I want to eat your pussy," "I want to fuck you" and called her such names as "cunt," "whore" and "bitch." The inmates in close management also made these and similar comments to Meyer and other female nurses as they walked to and from the close management dorms.

218.   Close management inmates in the isolation or "pink" rooms in the infirmary in the medical unit routinely stood on the toilets and exposed themselves and masturbated at Meyer and shouted sexual epithets at her and other female nurses. At one point, the female nurses put curtains over the windows to the "pink" rooms. The curtains provided some relief. However, she and the other nurses were told to remove the curtains.

219.   Shortly before she resigned in July 2001, Meyer was making medication rounds in the close management dorms, escorted by Lieutenant Ferguson. She had finished her rounds, but Ferguson was still talking to an inmate, which meant she had to wait on him. While she was effectively trapped in the dorm as Ferguson talked with an inmate, 10 or more of the inmates screamed sexually degrading and demeaning comments and obscenities at her, stood on their toilets masturbating and ejaculated on the windows of their cell doors. Meyer yelled to Ferguson to look at what was happening. He ignored her. She then fled the dorm. She later asked him why he did not let her out of the dorm. Ferguson became angry and told her that she was "looking for it." The incident so traumatized Meyer that she took a medical "stress" leave and then resigned.

220.   The Department did not give Meyer any training to prepare her for or to address sexual harassment by inmates.

- 42 -

221.    The harassment described above occurred throughout Meyer's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Sushma Parekh

222.    Plaintiff Sushma Parekh was employed by the Department at Martin CI as a Senior Physician and Chief Health Officer. She was hired in July 1997 and left in October 2001.

223.    Parekh's duties as a Senior Physician included making weekly rounds of the inmates in close management, seeing inmates in the infirmary, and supervising nurses. Her duties as Chief Health Officer were the same with the additional duties of administering the medical unit at Martin CI. Her duties required regular contact with inmates in close management custody.

224.    While Parekh made weekly rounds of inmates in close management, the inmates regularly exposed themselves and masturbated at her. While doing so, the inmates made sexually harassing and profane comments to her such as wanting to have sexual intercourse with her or about her and the female anatomy. The same kinds of comments were made to her as she walked to and from her office in the medical building to the close management dorms.

225.    Close management inmates would also be housed in the isolation cells in the medical building. These inmates routinely exposed themselves and masturbated at Parekh and female nurses in the same manner as inmates in the close management dorms.

226.    Inmates in close management would routinely call for medical emergencies that were false when they knew female nurses were on duty so that a female nurse would have to come to close confinement. Most medical or psychiatric emergencies were faked for this purpose. Whenever a new female psych specialist or nurse was hired, the number of medical emergencies

- 43 -

would increase so that the inmates could harass her.

227.    Whenever possible, Parekh filed DRs against the inmates who exposed themselves and masturbated at her.  On numerous occasions she informed Warden Mingo of the sexual harassment she and the other female nurses were experiencing.  Mingo instructed time and again that she should write DRs against the inmates.  She and other nurses did so.  Nothing came of any of the DRs she and the nurses submitted despite the fact that Warden Mingo told Parekh that the Department would take action against the inmates such as removing privileges.  When she asked why nothing was happening, she was told only to continue to file DRs.  It seemed to Parekh that the DRs were going into the garbage.  Parekh and the female nurses were not given any training on how to write DRs.

228.    In addition to there being no apparent action taken on the DRs and no change in the inmate's behavior, on numerous occasions Parekh and the nurses often could not get Correctional Officers to witness and support their DRs.  Correctional Officers would ignore or say that they did not see the inmate's sexual harassment of Parekh and the female nurses.  Security personnel also appeared to take the attitude that nothing would be achieved by writing DRs, so they did not want to take the time to do it.  Parekh was also told that because security personnel were short the nurse would just have to make do.

229.    In addition to writing DRs, Parekh and the female officers routinely made notations on the medical records and the charts of inmates of the sexual harassment.

230.    At one point, Parekh and the female nurses refused to give medications to inmates who were masturbating.  They were later told that masturbation could not be considered a refusal of medication and that they must give the medication to the inmates even if they were

- 44 -

masturbating.

231.    The Department did not give Parekh any training to prepare her for or to address sexual harassment by inmates.

232.    The harassment described above occurred throughout Parekh's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Lourdes Silvagnoli

233.    Plaintiff Lourdes Silvagnoli has been employed by the Department at Martin CI as a Senior LPN since October 2000.

234.    Silvagnoli's duties as a Senior LPN include dispensing medications to inmates in close management, responding to medical emergencies in the close management dorms, attending to inmate houses in the SOS or "pink" rooms in the medical building as well as dispensing medications to oper population inmates at the medical building. Her duties require regular contact with inmates in close management confinement.

235.    Silvagnoli passes medications to inmates in close confinement twice daily. Inmates expose themselves and masturbate at her every time she goes to the close management dorms. Many do it while receiving medications at their cell doors. Others stand on the toilets in the cells so that they can be seen through their cell door windows. Others do it while their cellmate talks to Silvagnoli and receives medication. On one occasion, an inmate ejaculated on the cell window at which Silvagnoli was dispensing medication. While they are masturbating, the inmates scream sexually degrading and demeaning comments such as "how wet is your pussy," "your pussy is really smelling," "I like the way you shake your ass" and call her "whore," "slut" and "cunt."

- 45 -

236. Silvagnoli has written numerous DRs on the inmates. She has been told that security personnel are supposed to write DRs. However, they do not do so unless they are forced to because of security staff shortages and the fact that it is time consuming to do so. On some occasions security personnel refuse to write DRs. On other occasions, security personnel will not write DRs, because Silvagnoli does not have another witness. On other occasions, security personnel who witness the sexual harassment tell Silvagnoli to write the DR. Silvagnoli has not been given any training on how to write DRs. She has generally stopped writing them, because it appears to be pointless since nothing results from it.

237. Silvagnoli and the other female nurses at one time refused medications to inmates who were masturbating. They were later told that they could not do this and that they were required to give the medication even if the inmate was masturbating.

238. The Department did not give Silvagnoli any training to prepare her for or to address sexual harassment by inmates.

239. The harassment described above occurred throughout Silvagnoli's employment at Martin CI and continues to occur. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Janet Smith

240. Plaintiff Janet Smith was employed by the Department from December 1990 to May 2001. She was employed at Martin CI as a Classification Officer from October 2000 until May 2001 when she voluntarily resigned her employment.

241. Smith's duties as a Classification Officer were to keep inmates informed of their custody status including such matters as receipt of, loss of or ineligibility for gain time, inmate job

- 46 -

opportunities and other information pertaining to sentences. She also monitored DR hearings and kept inmates aware of rules and rights pertaining to them. Her duties required her to have regular contact with inmates in close management custody.

242. During her employment as a Classification Officer, Smith was required to meet with close management inmates at which times the inmates routinely exposed themselves and masturbated at her. While performing her duties in the close management dorms, inmates also attempted to grab her, tried to ejaculate on her and regularly abused her with sexually degrading and demeaning comments such as "I can smell your pussy," "I'm gonna get a hold of you and fuck you," and "suck my dick."

243. Smith was routinely required to visit inmates in close confinement without the escort of a Correctional Officer. She was sometimes able to get an Officer to accompany her, but often because of the time and staffing problems it was impossible. When she entered the confinement dorm, inmates shouted sexually degrading and demeaning comments at her, and some began masturbating. Many would stand on the toilets in the cells and masturbate at her so they could be better seen by her.

244. During the period Smith was employed as a Classification Officer, the then Superintendent of Martin CI ordered that the locks be removed from the food slots in the cells doors of the close confinement cells. Smith and members of the nursing staff at Martin CI objected to this. Their objections were ignored. They were told by the Assistant Superintendent that the complaints about inmate behavior were exaggerated. The Assistant Superintendent said he had never experienced this kind of inmate behavior. Another female Classification Officer also complained to the Superintendent, and she was later summoned to the office of the Assistant

Superintendent and reprimanded for going over his head.

245.    Smith and other classification officers and medical staff requested that the
Department remedy the harassment, including suggesting one-way film on windows. Their
suggestions were rejected.

246.    Smith wrote DRs on the inmates. However, nothing ever came of those that she
wrote and she found it of no effect to do so.

247.    The Department did not give Smith any training to prepare her for or to address
sexual harassment by inmates. It is her understanding that such training had at one time in the
past been given to Classification Officers but was subsequently eliminated.

248.    The harassment described above occurred throughout Smith's employment as a
Classification Officer at Martin CI. She did nothing to welcome the conduct, and she found it
offensive and physically disgusting.    Smith resigned, because she could no longer tolerate the
sexual harassment described above.

Michelle Pollock

249.    Plaintiff Michelle Pollock was employed by the Department at Martin CI as a
Senior RN from April 1990 to September 2001.

250.    Pollock's duties as a Senior RN at Martin CI included preparing medications and
dispensing medication to inmates in the medical unit and in close management, responding to
medical emergencies and making sick rounds for close management inmates. In addition to these
duties, she monitored the incidence of infectious diseases and HIV patients for tuberculosis and
filled in for the nursing supervisor and for LPNs. Her duties required regular contact with inmates
in close management.

251. Throughout her employment, inmates in close management custody regularly exposed themselves and masturbated at Pollock. This occurred both when she was required to attend to inmates in close management housing and in the medical unit. Inmates stood naked on the toilets in the cells masturbating so that Pollock and other female nurses could not avoid seeing them. Inmates in close management custody have masturbated at her while in the lobby of the medical unit. Other inmates confined in the isolation or "pink" rooms in the medical unit building faked psychiatric emergencies to get into the rooms so that they could harass Pollock and the female nurses by masturbating at them.

252. While exposing themselves and masturbating, the inmates regularly made sexually degrading and demeaning comments to Pollock such as "You know you want this," "I know you want this big, black dick," "I want to eat your pussy," and the like. The inmates also shouted these and similarly sexually degrading and demeaning comments at Pollock and other female nurses at Martin CI while they were walking to and from the close management housing to make sick calls and dispense medication.

253. Pollock and other members of the medical staff at Martin CI searched for ways to remedy this sexual harassment. They asked that inmates be brought up on "outside" charges. This was never done. She and the other female nurses were told to write DRs, which they did. However, the DRs appeared to disappear or were rejected. In some cases, Pollock was assisted by Correctional Officers in writing DRs, but this had no effect.

254. Pollock and the other female nurses complained about this sexual harassment to officials at Martin CI and were told in response that if they could not handle it they should quit. Pollock was reminded that she worked in a prison and that the close management cells were the

- 49 -

inmates' "house."

255. The Department did not give Pollock any training to prepare her for or to address sexual harassment by inmates.

256. The harassment described above occurred during Pollock's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Vesna Poirier

257. Plaintiff Vesna Poirier was employed by the Department as a Senior RN at Martin CI from September 2000 to July 2001, when she voluntarily resigned.

258. Poirier's duties as a Senior RN included dispensing medication and responding to medical emergencies and sick calls to inmates in the close management housing as well as attending to inmates in the infirmary of the medical unit at Martin CI. Her duties required regular contact with inmates in close management.

259. Throughout her employment at Martin CI, inmates in close management custody regularly exposed themselves and masturbated at Poirier. The inmates regularly made emergency calls for medical assistance that were faked for the purpose of getting Poirier and other female nurses to come to the close management house so that the inmates could sexually harass them by exposing themselves and masturbating at them.

260. While-and in addition to-exposing themselves and masturbating at Poirier, inmates regularly made sexually degrading and demeaning comments to Poirier, such as "Suck on this," "I wanna fuck you," "I wanna lick your pussy," and the like.

261. The sexual harassment was so intense that on occasion female nurses were unable to go into close management housing. When Poirier went into close management housing, she

tried, albeit unsuccessfully, to not look around, because there were always inmates masturbating at her and positioning themselves so that she could not avoid seeing them while they did so. On one particular night shift, Poirier spent the entire shift responding to emergency calls in close management; inmates masturbated at her each time she responded.

262. Poirier would never enter close management housing without a Correctional Officer escort. She was once told by a security official that if she could not go into the unit by herself she should not work there. She responded that she was a civilian and that the security was provided for her.

263. Inmates in close management custody knew that they could get out of close management housing and into the medical unit if they cut themselves and would do so. They would be placed in the isolation or "pink" rooms on "suicide watch" which required Poirier and the other nurses to continually observe the inmates. The inmates used this as an opportunity to masturbate at Poirier and other female nurses. When Poirier began working at Martin CI, the nurses had put up screens on the windows of the doors of the "pink" rooms. This allowed them some relief from the sexual harassment by inmates. However, the Department later prohibited the nurses from doing this

264. Poirier and the nurses met once with the warden to discuss the sexual harassment. The warden suggested that the nurses were being unreasonable and told them that they should either wait for the inmate to stop masturbating or skip the inmate and come back to him when he was finished.

265. Poirier and the other female nurses wrote numerous DRs on inmates for masturbating. At the meeting described above, she and the nurses asked the warden about the

status of their DRs. They were told only that the DRs were "under investigation." Some of the DRs she wrote were rejected, because Poirier used the term "masturbation" rather than describe in pornographic detail the manner in which the inmate was masturbating.

266.    The Department did not give Poirier any training to prepare her for or to address sexual harassment by inmates.

267.    The harassment described above occurred during Poirier's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting. Poirier resigned, because she could no longer tolerate the sexual harassment described above.

Susan Black

268.    Plaintiff Susan Black has been employed by the Department as a Senior RN at Martin CI at various times from 1987 to present.

269.    Black's duties as a Senior RN include dispensing medication and responding to medical emergencies and sick calls to inmates in the close management housing as well as attending to inmates in the infirmary of the medical unit at Martin CI. She also monitors all infectious diseases, including HIV inmates. Her duties require regular contact with inmates in close management custody.

270.    Throughout her employment at Martin CI, inmates in close management custody have exposed themselves and masturbated at Black. Virtually at any time she went into the close management housing, inmates masturbated at her. The inmates often stood up on the toilets or sinks in their cells so that they could be better seen by Black and masturbated at her. In one instance an inmate masturbated at her from the toilet in his cell, ejaculated on a piece of paper and showed it to her, saying "this is for you." She wrote a DR on him but never heard anything

further.

271.    Close management custody inmates also faked suicidal complaints so that they would be placed in the isolation cells in the infirmary where they exposed themselves and masturbated at Black and other female nurses.

272.    While exposing themselves and masturbating at her, as well as at other times, the inmates made sexually degrading and demeaning comments to Black, such as "Hi, Miss Black, I've got a great big black dick for you," "I want to suck your pussy," "Let me stick this dick up your ass," "Oh! I'm coming, I'm coming. This is for you," "I smell pussy," "Why don't you take a bath some times? Your pussy smells like fish," "What's the matter, you ain't had no good dick in a while? I've got some good dick for you," and the like.

273.    Black wrote numerous DRs on these inmates. She was never told whether they went through and was never called upon to testify or otherwise tell what happened. She felt it was a waste of time to write DRs, because often the DRs were sent back to her to redo, allegedly because she had not filled them out correctly. In some cases, the DRs were returned multiple times.

274.    The Department did not give Black any training to prepare her for or to address sexual harassment by inmates.

275.    The harassment described above occurred during Black's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Donna Pixley

276.    Plaintiff Donna Pixley was employed by the Department as a Senior LPN at Martin

- 53 -

CI from March 1999 to July 2001.

277. Pixley's duties as a Senior LPN included dispensing medication on a daily basis and responding to medical emergencies and sick calls to inmates in the close management housing as well as attending to inmates in the infirmary of the medical unit at Martin CI. Her duties required regular contact with inmates in close management.

278. Throughout Pixley's employment at Martin CI, inmates in close management custody regularly exposed themselves and masturbated at her. This occurred regularly when she was making daily medication passes or rounds. When she or other female nurses arrived in the close management housing unit B, inmates would call out "work call" which was a signal to other inmates that a nurse was present and to expose themselves and masturbate at her. While they exposed themselves and masturbated at her, the inmates made sexually degrading and demeaning comments, such as "I can smell your pussy," and "bitch, you need to take off that jacket. We need to see some ass," "look, nurse, I got something for you" and the like. Inmates accused Pixley of having sexual relationships with Correctional Officers. Anytime Pixley dropped something for which she had to bend over the inmates would make sexually degrading and demeaning comments about her body. As a result Pixley tried never to bend over and further always wore a lab coat.

279. Inmates would routinely fake medical emergencies in order to expose themselves and masturbate at Pixley when she responded.

280. Inmates would claim they were suicidal in order to be placed in the isolation or "pink" rooms in the infirmary. There they exposed themselves and masturbated at Pixley and the female nurses who were required to continually watch them.

- 54 -

281. Pixley wrote numerous DRs on these inmates. However, the DRs never seemed to achieve anything and she ultimately gave up.

282. Pixley and other nurses met with the warden and explained to him the problems. The warden said they would be addressed; however, nothing changed.

283. The Department did not give Pixley any training to prepare her for or to address sexual harassment by inmates.

284. The harassment described above occurred during Pixley's employment at Martin CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Paula LaCroix

285. Plaintiff Paula LaCroix has been employed by the Department as a Senior LPN at Martin CI since August 1999.

286. LaCroix's duties as a Senior LPN include dispensing medication and responding to medical emergencies and sick calls to inmates in the close management housing as well as attending to inmates in the infirmary of the medical unit at Martin CI. Her duties required regular contact with inmates in close management.

287. Throughout LaCroix's employment at Martin CI, inmates in close management have exposed themselves and masturbated at her on a daily basis. The inmates stand naked on toilets and masturbate so that she has to see them while she waits in the control unit and as she administers medications or as she goes to each cell to visually assess the condition of each inmate.

288. LaCroix has written numerous DRs on close management inmates, but the inmates were never punished for masturbating in her presence. Though she was not encouraged by

administrative officials to write the DRs, she continued to do so in an effort to try to get rules enforced that required that inmates be dressed for sick call, for medication passes, and for medical rounds.

289.    LaCroix and other nurses were also sexually harassed by close management inmates who were receiving medical treatment in the medical unit. Inmates masturbate in direct view of the nursing station.

290.    While they expose themselves and masturbate at her, the inmates regularly make sexually degrading and demeaning comments to LaCroix, such as "I smell your pussy" and "Don't you want some of this?"

291.    Recently, as LaCroix was being sexually harassed, she tried to alert her security escort so that he could witness the offense. She was finally able to do so by moving the Correctional Officer to her other side. The officer ended up in front of the cell-door window just as the inmate ejaculated on it. The officer did not write a DR on that inmate.

292.    The Department did not give LaCroix any training to prepare her for or to address sexual harassment by inmates.

293.    The harassment described above occurred throughout LaCroix's employment at Martin CI and continues to occur. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

Olivia Crisafi

294.    Plaintiff Olivia Crisafi was employed by the Department as a Senior LPN at Glades CI from January 2001 until April 2001.

295.    Crisafi's duties as a Senior LPN included dispensing medication and responding to

medical emergencies and sick calls to inmates in the close management housing as well as attending to inmates in the infirmary of the medical unit at Glades CI. Her duties required regular contact with inmates in close management.

296.    During Crisafi's employment at Glades CI, male inmates in close management custody routinely exposed themselves and masturbated at her while she was doing her rounds in the close management dorms. On one occasion in close management housing, an inmate called Crisafi over to his cell, allegedly to see something on his leg. The inmate masturbated at her. She told the Correctional Officer accompanying her that she would not treat the inmate. The officer only laughed. On another occasion, an inmate masturbated at her outside the nurses' station in the medical unit building.

297.    While they exposed themselves and masturbated, the inmates made sexually degrading and demeaning comments to Crisafi such as "Damn, you're fine" and the like.

298.    Crisafi did not write DRs on any of the inmates but told the charge nurse, and the inmates' behavior was witnessed by Correctional Officers.

299.    The Department did not give Crisafi any training to prepare her for or to address sexual harassment by inmates.

300.    The harassment described above occurred during Crisafi's employment at Glades CI. She did nothing to welcome the conduct, and she found it offensive and physically disgusting.

## Jean Garrett

301. Plaintiff Jean Garrett is employed by the Department as a RN Specialist at Lake CI. She has been so employed since January 4, 2002.

302. Garrett's duties include assessing patients, responding to medical and psychiatric

emergencies, and dispensing medications to male inmates in close management custody. Her duties require regular contact with male inmates in close management custody. She and the other nurses at Lake CI are required to make daily rounds of the close management inmates and to visually inspect all of them within their areas of work.

303. Throughout Garrett's employment, specifically beginning within the first two weeks of her employment at Lake CI, male inmates have regularly exposed their genitals and masturbated at her and the other female nurses. While doing so, the inmates frequently abused her and other female nurses there with sexually degrading and demeaning comments, such as, "I'm going to slide my dick in your mouth and your ass," and about her "red pussy" as well as exposing a penis while saying, "This is for you."

304. Isolation cells are directly behind the nurses' station, and the medication room has direct view of all the cells. Garrett and other nurses have requested one way screens but management told them, "It's not in the budget." Inmates stand on their commodes, sinks, and mattresses to be seen while they masturbate at the nurses.

305. On numerous occasions, Garrett and the other nurses at Lake CI have informed the Department of the sexual harassment they have suffered and have sought relief.

306. Garrett has written DRs on inmates who have exposed themselves to her and masturbated at her. The DRs have been filed with the prison security at Lake CI.

307. One Lt. Stafford has made comments to Garrett like, "You knew you were in a male prison when you started here; now you will have to deal with it." Other statements by correctional officers include, "Women shouldn't be here in the first place," and, "Some women ask for it."

- 58 -

308.    Until approximately March 2002, well after the underlying administrative

complaints in this case were filed by other putative class representatives, did the Department give

Garrett or the other nurses any training to prepare her for or to address sexual harassment by

inmates.

309.    The harassment described above has occurred throughout Garrett's employment at

Lake CI and continues to occur. Garrett has done nothing to welcome the conduct, and she has

found it offensive and physically disgusting.

### Cause of Action

#### (Florida Human Rights Act of 1977 and Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes)

310.    The Plaintiffs reallege paragraphs 1 through 309.

311.    This claim is brought on behalf of all Plaintiffs and the class they seek to represent.

312.    All Plaintiffs and the class are women and each is a "person aggrieved" under the

Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes.

313.    The Department is an "employer" of the Plaintiffs and the class under the Florida

Civil Rights Act of 1992, Chapter 760, Florida Statutes.

314.    The acts of sex discrimination and sexual harassment described herein were done

on account of the Plaintiffs' sex.

315.    The acts of sex discrimination and sexual harassment described hereinabove are

severe and pervasive and have affected and continue to affect the terms and conditions of the

Plaintiffs' employment.

316.    The acts of sex discrimination and sexual harassment described hereinabove were

unwelcome and offensive to the Plaintiffs.

317. The Department knew or should have known of the acts of sex discrimination and sexual harassment described hereinabove, and at all times relevant to this action, the inmates referred to herein were in the custody and control of the Department and the officials of the Department referred to hereinabove were agents of the Department and were acting in the course and the scope of their authority.

318. The foregoing acts of sex discrimination and sexual harassment violate the Plaintiffs' right to be free from sex discrimination and sexual harassment under the Florida Human Rights Act of 1977 and the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes.

319. As a direct result of the foregoing acts of sex discrimination and sexual harassment, the Plaintiffs have lost wages and other employment benefits and/or have suffered emotional distress, humiliation, embarrassment, anguish and loss of enjoyment of life.

320. The foregoing acts of sex discrimination and sexual harassment are continuing in nature.

## Jury Demand

321. Plaintiffs demand trial by jury on all issues so triable.

## Prayer for Relief

WHEREFORE, Plaintiffs demand the following relief:

a. That the Court certify this matter as a class action pursuant to the provisions of subsection (b)(2) or, alternatively, (b)(3) of Rule 1.220 of the Florida Rules of Civil Procedure and certify the Plaintiffs as class representatives and their counsel as class counsel;

b.     That the Court declare that the Department's practices complained of

herein are unlawful and violate the Florida Human Rights Act of 1977 and the

Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes;

c.     That the Court enjoin the Department from engaging in each of the

unlawful practices, policies, customs and usages set forth herein;

d.     That the Court order the Department to enforce and implement policies,

practices and procedures to remedy the unlawful practices complained of herein;

e.     That the Court enter judgment awarding the Plaintiffs and the class lost

wages and other employment benefits and/or compensatory damages for emotional

distress, humiliation, embarrassment and anguish;

f.     That the Court enter judgment awarding the Plaintiffs reasonable attorneys'

fees and costs and expenses of suit;

g.     That the Court enter judgment awarding prejudgment interest as allowed

by law; and

h.     That the Court order such other and further relief as is just and proper.

Dated this 9th day of May, 2002.

C. WES PITTMAN
Fla. Bar No. 220507
Pittman & Perry, P.A.
432 McKenzie Avenue
Panama City, FL 32401
(850) 784-9000
(850) 763-6787 (fax)

JOHN C. DAVIS

- 61 -

Fla. Bar No. 0827770
Spriggs & Davis, P.A.
324 W. College Avenue
Tallahassee, FL 32301
(850) 224-8700
(850) 224-8836 (fax)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing First Amended Complaint with First Interrogatories and

First Request for Production of Documents Attached was served upon Mr. Michael Moore,

Secretary of the Department of Corrections, State of Florida, and served by Priority U.S. certified

mail, return receipt requested, this _9 th_ day of May, 2002.

C. WES PITTMAN
Fla. Bar No. 220507
Pittman & Perry, P.A.
432 McKenzie Avenue
Panama City, FL 32401
(850) 784-9000
(850) 763-6787 (fax)